**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**MA-LI WONG,**

                                        **Plaintiff,**

    **vs.**                                                      **5:21-CV-1338**
                                                                    **(MAD/MJK)**

**STATE OF NEW YORK, THE STATE**
**UNIVERSITY OF NEW YORK, THE STATE**
**UNIVERSITY OF NEW YORK UPSTATE**
**MEDICAL UNIVERSITY,**

                                        **Defendants.**
_____

**APPEARANCES:**                              **OF COUNSEL:**

**DANNY GRACE, PLLC**                         **DANIEL GRACE, ESQ.**
225 Broadway - Suite 1200                     **DOUGLAS MACE, ESQ.**
New York, New York 10007
Attorneys for Plaintiff

**OFFICE OF THE NEW YORK**                    **MARK J. DOLAN, AAG**
**STATE ATTORNEY GENERAL**                    **MELISSA A. LATINO, AAG**
The Capitol
Albany, New York 12224
Attorneys for Defendants

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

Plaintiff initiated this action by filing a complaint on December 14, 2021. *See* Dkt. No. 1.

Plaintiff filed an amended complaint on February 4, 2022. *See* Dkt. No. 12. Plaintiff alleges that

Defendants New York State ("NYS"), The State University of New York ("SUNY"), and The

State University of New York Upstate Medical University ("SUNY Upstate" and collectively,

"Defendants") discriminated and retaliated against her because of her ethnicity and/or gender in

1

violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et. seq.* ("Title VII").  *See id.*

Presently before the Court is Defendants' motion for summary judgment, which Plaintiff has opposed.  *See* Dkt. Nos. 43, 52, 53.

## II. BACKGROUND

The following facts are derived primarily from Plaintiff's response to Defendants' statement of material facts, *see* Dkt. No. 52, and Defendants' response to Plaintiff's counterstatement of material facts.  *See* Dkt. No. 53-1.

Plaintiff is a Hispanic female, and licensed doctor and psychiatrist.  *See* Dkt. No. 52 at ¶ 2; Dkt. No. 53-1 at ¶ 1.  In Plaintiff's declaration, she states that she is "of Latino National Origin." Dkt. No. 52-3 at ¶ 2.  She testified during her deposition that she was born in Hong Kong in 1950 and moved to Brazil in 1960.  *See* Dkt. No. 43-2 at 9.  Plaintiff's husband, Julio Licinio, M.D., Ph.D., is Hispanic.  *See* Dkt. No. 52 at ¶ 3.  Dr. Licinio was recruited by former SUNY Upstate President Danielle Laraque-Arena, M.D., to be SUNY Upstate's Dean of the College of Medicine in 2016.  *See id.* at ¶ 4.  As part of her recruitment efforts, Dr. Laraque-Arena offered Plaintiff a tenured research faculty position in the Department of Psychiatry.  *See id.* at ¶ 5.

Prior to accepting an offer of employment, Plaintiff discussed her position and compensation with Dr. Laraque-Arena.  *See id.* at ¶ 6.  Throughout the negotiation process, Plaintiff consulted with a New York attorney who reviewed the employment contract.  *See id.* at ¶ 7.  The decision to hire Plaintiff was entirely within Dr. Laraque-Arena's province.  *See id.* at ¶ 8. At the time she was hired, Plaintiff did not have any grant funding that was transferable to SUNY Upstate.  *See id.* at ¶ 9.  Thomas Schwartz, M.D., was the interim Chair of the Department of Psychiatry.  *See id.* at ¶ 54.  He was appointed to Chair of the Department in September 2020,

2

following four years as interim Chair.  *See id.* at ¶ 53.  "With the exception of Plaintiff, a tenured professorship has never been offered to an unfunded researcher in [SUNY Upstate's] Psychiatry Department since Dr. Thomas Schwartz has been Department Chair and interim Chair."  *Id.* at ¶ 10.

Defendants contend that Dr. Laraque-Arena offered Plaintiff a starting salary of $220,000, which comprised $120,000 as a base salary and $100,000 in "ALR."  *Id.* at ¶ 11.  ALR means "also receives" which Defendants assert was offered to Plaintiff to supplement her income until she could apply for and secure grant funding.  *Id.* at ¶ 13.  Defendants aver that "$220,000 was above the median salary for psychiatry research faculty in the United States according to the Association of American Medical Colleges . . . salary survey."  *Id.* at ¶ 12.  Defendants also note that ALR is annually reviewed because it is not intended to permanently supplement an employee's income.  *See id.* at ¶ 15.  The ALR is intended to be reduced, eliminated, or transitioned to departmental funding within two-to-three years of hiring.  *See id.* at ¶ 16.

Plaintiff disagrees.  She asserts that Dr. Laraque-Arena offered Plaintiff the $220,000 as a base salary which "was 'secure' and not going to be taken away."  *Id.* at ¶ 11.  Plaintiff contends that her salary was lower than other base salaries for professors in 2017 at SUNY Upstate.  *See id.* at ¶ 12.  Plaintiff states that there is no formal policy governing the distribution of ALR.  *See id.* at ¶¶ 14-15.

Plaintiff agrees that her compensation package included a two-year stipend of $30,000.  *See id.* at ¶ 17.  She also agrees that her "recruitment incentives" included a commitment of $5,386,668 for her laboratory requirements.  *Id.* at ¶ 18.  Defendants assert that her startup package "was not only in excess of that give[n] to all other research faculty members at [SUNY Upstate], but was unprecedented in light of the fact that Plaintiff was not funded by any grants

when she was hired by [SUNY Upstate]." *Id.* at ¶ 19.  Plaintiff contends that her startup package was "generous" but that it "was justified by her extreme likelihood of quickly securing grants; [she] held Australian federal grants at the time she was hired and had a consistent professional history of holding grants when she was employed in the United States." *Id.*  Defendants also state that Plaintiff's starting salary was higher than the "starting salary of each of the twenty-six . . . other research faculty members that [SUNY Upstate] hired between 2017 and 2020." *Id.* at ¶ 20. Plaintiff objects to this statement arguing that the cited material does not support the contention. *See id.*  In a chart provided by Dr. Schwartz, it shows the salary breakdowns for the Department of Psychiatry faculty that were similarly situated to Plaintiff as "full research professors" from 2017 to 2020.  Dkt. No. 43-18.  They are male, female, white, Hispanic, and Asian.  *See id.* Plaintiff's total salary was the highest for all four years.  *See id.*  Another chart also indicates that Plaintiff's total compensation was higher than the average psychiatry professor across the country. *See* Dkt. No. 43-8.

Plaintiff received an offer letter from SUNY Upstate on March 13, 2017, which stated Plaintiff's starting salary as consisting of a base salary of $120,000 and $100,000 ALR.  *See* Dkt. No. 52 at ¶ 21.  Plaintiff agrees that is what the document says, but argues that the document does not accurately reflect her conversation with Dr. Laraque-Arena.  *See id.*[1]  Her SUNY Upstate offer letter explained that "[s]eparate and apart from your base salary you will receive additional compensation in the amount of $100,000.  This additional compensation is not subject to [] negotiated raises, is reviewed annually and is subject to adjustment or renewal, which may also result in an increase in your base salary."  Dkt. No. 43-9 at 1.

---

[1] Neither party provided a declaration or affirmation from Dr. Laraque-Arena.

Plaintiff also received an offer letter from Psychiatry Faculty Practice, Inc. ("PFP"), a non-profit medical service group made up of SUNY Upstate faculty, on March 13, 2017, which stated that her "base salary" was $220,000. Dkt. No. 52 at ¶ 23; *see also* Dkt. No. 53-1 at ¶ 4; Dkt. No. 43-7 at ¶ 2. The PFP letter failed to provide the appropriate break down of Plaintiff's salary. *See* Dkt. No. 52 at ¶ 23.

Prior to signing anything, Plaintiff spoke with her husband about the offer letters who told Plaintiff that their attorney approved her agreement. *See id.* at ¶ 26. Plaintiff signed both offer letters on March 15, 2017, without speaking to anyone else. *See id.* at ¶ 27.

In October 2017, Plaintiff avers that "[w]hen [she] realized the inconsistencies between the SUNY Upstate Agreement and the PFP Agreement, she immediately approached Dr. [] Schwartz . . . about the salary discrepancy." Dkt. No. 53-1 at ¶ 7; *see also* Dkt. No. 52 at ¶ 28. She contends that Dr. Schwartz "initially refused to discuss it and directed Plaintiff to discuss it with the former President of SUNY Upstate." Dkt. No. 53-1 at ¶ 7. She further asserts that she "noted that reducing her base salary in this fashion would decrease her total benefit package, and that a reduced base salary was comparable to her starting salary when she became a tenured professor twenty (20) years prior." *Id.* at ¶ 8. In response to Defendants' statement of material facts Plaintiff states it is "undisputed" that she requested her salary be increased, and that Dr. Schwartz advised her that SUNY Upstate would not increase her salary before she began working. *See* Dkt. No. 52 at ¶¶ 28-29.

Plaintiff began working for SUNY Upstate on December 11, 2017, with a primary appointment as Professor of Psychiatry and Behavioral Science and a secondary appointment as Professor of Neuroscience and Physiology. *See* Dkt. No. 53-1 at ¶ 2. Plaintiff does not dispute

that she did so "[w]ith knowledge that her State base salary would remain at $120,000." Dkt. No. 52 at ¶ 30.

In April or May 2018, Plaintiff met with Dr. Laraque-Arena and requested that her ALR be converted to her base salary. *See id.* at ¶ 31.  "On May 30, 2018, Dr. Schwartz offered to increase Plaintiff's State base salary from $120,000 to $175,000, with a corresponding reduction in her ALR to $45,000 to maintain her total compensation at $220,000 (plus her $30,000 stipend from the PFP)." *Id.* at ¶ 33.  Plaintiff countered and requested that her State base salary be increased to $180,000. *See id.* at ¶ 34.  Dr. Schwartz rejected Plaintiff's counteroffer on June 11, 2018, and Plaintiff responded the same day stating, "Hi Tom, Yes, you can proceed." *Id.* at ¶¶ 35-36.  During this time, Plaintiff did not complain of discrimination. *See id.* at ¶ 37.  Dr. Laraque-Arena resigned in December 2018. *See* Dkt. No. 43-19 at ¶ 10.

Defendants contend that "Plaintiff's total State compensation has been among the top three highest paid individuals of all tenured research professors in the Psychiatry Department at all times." Dkt. No. 52 at ¶ 41.  They assert that as of June 2024, "she is the second highest paid researcher in the Department, second only to another researcher who was just recently ranked among the top 80 researchers in the world." *Id.* at ¶ 42.  Plaintiff disputes these assertions, claiming that her "base state salary was only in the top three highest-paid tenured research professors in 2018.  [Her] base state salary was no higher than fourth among the eight tenured professors in 2017, 2019, and 2020." *Id.* at ¶ 41.  She also contends that Dr. Schwartz' declaration, to which Defendants cite, "does not provide data regarding current total compensation amounts for tenured research professors in the Psychiatry Department." *Id.* at ¶ 42.  Plaintiff agrees that she had the highest total State compensation of all researchers in the Department in 2017-2018.  *See id.* at ¶ 56.  She had the second highest total compensation in

2019.  *See id.* at ¶ 57.  Her husband, Dr. Licinio, had the highest.  *See id.*  Dr. Licinio was

designated as a Distinguished Professor, which is a designation Plaintiff did not attain until 2022.

*See id.*  In 2020, she had the third highest compensation.  *See id.* at ¶ 58.  Her husband, who is

Hispanic, and another white male Distiguished Professor had higher compensation.  *See id.*  The

other professor's compensation was $219 more than Plaintiff's compensation.  *See id.*

Plaintiff asserts, by citing to her own declaration, that she "would later learn that her total

compensation was significantly lower than her male and/or non-Hispanic colleagues despite her

superior academic record and credentials."  Dkt. No. 53-1 at ¶ 9.  Plaintiff states that her "work

environment during her first eighteen months of employment at SUNY Upstate was extremely

difficult."  *Id.* at ¶ 10.  She was told that her research lab would be ready in December 2017 or

January 2018, but her lab space was not ready for an additional fifteen months, until March 2019.

*See id.* at ¶¶ 11-12.

Defendants aver that construction went beyond the anticipated completion date because of

the bidding and procurement process that had "to be followed, including the requirement to follow

state procurement rules after Plaintiff requested changes to the construction plan."  Dkt. No. 52 at

¶ 43.  Plaintiff does not dispute the necessary requirements for the bidding and procurement

process and the delays it incurred.  *See id.*  She does, however, assert that Nicholas Steffen, her

primary point of contact for the lab, told "her that other projects took precedence over her lab and

that certain materials were not ready for [her] lab construction.  [Her] lab was further delayed by

the onset of the COVID-19 pandemic."  *Id.*  Plaintiff agrees that she was provided a temporary

space to perform her research while the construction was ongoing.  *See id.* at ¶ 44.  Plaintiff

contends that she "repeatedly pleaded to have her lab space completed and inquired about the

cause for the delays, to no avail."  Dkt. No. 53-1 at ¶ 13.  She states that she "was told to expect

continued delays and that her lab would not be ready by January 2018." *Id.* at ¶ 14.  Plaintiff

agrees, however, that Dr. Schwartz approached Dr. Licinio and the Vice Chair of Research on

multiple occasions to determine why there were delays in construction.  *See* Dkt. No. 52 at ¶ 45.

She also does not dispute that Dr. Schwartz asked those in charge of the project about speeding up

the process.  *See id.*

      Plaintiff avers that she learned "that when a non-Hispanic male colleague who was fifteen

years junior to Plaintiff in his academic training and experience also complained about the failure

to get his lab set up in an expeditious manner when he started with SUNY Upstate, his lab was

then set up within a few months of his contract commencement date."  Dkt. No. 53-1 at ¶ 15.

Defendants argue that Plaintiff fails to identify this other colleague or the similarities in their labs,

and that Plaintiff testified that the lab delays were not a result of discrimination.  *See id.*; *see also*

Dkt. No. 43-2 at 130.

      Plaintiff alleged in her amended complaint that in 2017, she sent letters of support to Dr.

Schwartz concerning three professors that she wished to collaborate with.  *See* Dkt. No. 12 at ¶

59.  Plaintiff alleged that her requests were delayed "substantially longer than other requests made

or supported by her non-Hispanic and/or male colleagues."  *Id.* at ¶ 60.  The parties agree that

requests by faculty to collaborate with other physicians are subject to submission of paperwork by

the individuals seeking voluntary faculty status.  *See* Dkt. No. 52 at ¶ 46.  Plaintiff also agrees that

the three individuals she supported were processed in the same manner that all applications are

processed.  *See id.* at ¶ 47.

      In March 2019, Dr. Schwartz e-mailed Plaintiff to inform her that her ALR would be

eliminated on July 1, 2019.  *See* Dkt. No. 53-1 at ¶ 17.  Plaintiff states that Dr. Schwartz did not

provide a reason or cause for the reduction.  *See id.*  Without a citation to any record evidence,

Plaintiff avers that "[s]ince June 2018, Dr. Schwartz, and subsequently the current President of Defendant SUNY Upstate Dr. Mantosh Dewan, have 'de novo' insisted that Plaintiff's ALR was only for two years." *Id.* at ¶ 18.  Plaintiff contends that the temporary nature of the ALR was "not written into the two signed contract letters with SUNY Upstate and the PFP." *Id.* at ¶ 19.  Defendants deny that Plaintiff was unaware of the temporary nature of her ALR. *See id.* at ¶¶ 18-19.  Following a meeting with Dr. Schwartz and Dr. Dewan, Plaintiff's ALR was extended until December 31, 2019. *See* Dkt. No. 52 at ¶ 39; *see also* Dkt. No. 43-14 at 1.  "Plaintiff was given a compensation total of a minimum of $250,000 for the first two years of employment, along with a $5,385,669 investment in her research commitment." *Id.* at ¶ 24.  Plaintiff did not complain of discrimination at this time. *See id.* at ¶ 40.

On November 1, 2019, Plaintiff filed a complaint with SUNY Upstate's Office of Diversity and Inclusion ("ODI"). *See* Dkt. No. 53-1 at ¶ 20.  She "complained that SUNY Upstate had violated both New York and federal laws that protect her against unlawful discrimination, retaliation, and bias." *Id.* at ¶ 22.  "Plaintiff requested that steps be taken to immediately halt the discriminatory treatment she was experiencing, including but not limited to, delaying the change to her ALR and other compensation until an investigation into her complaints was complete." *Id.* at ¶ 23.

In January 2020, students complained of the existing M.D./Ph.D. Program Director's inability to allocate sufficient time to mentor students. *See* Dkt. No. 52 at ¶ 48.  The students were asked to create a list of faculty members that they thought would make a good program director. *See id.* at ¶ 49.  Amit Dhamoon, M.D., Ph.D., was first on the students' list. *See id.* at ¶ 50.  Plaintiff was not on the students' list. *See id.* at ¶ 51.  Dr. Dhamoon was unanimously selected as the preferred candidate as he had graduated from the M.D./Ph.D. program and had

significant experience mentoring students. *See id.* at ¶ 52.  In September 2020, Dr. Schwartz was appointed as the Department of Psychiatry Chair. *See id.* at ¶ 53.  Dr. Dewan approved the decision because Dr. Schwartz was nationally recognized, had served as the interim Chair for four years, and had done well with the Department during the COVID-19 pandemic. *See id.* at ¶ 54.

Plaintiff alleges that she did not hear back from ODI "for over eleven months" and she filed a complaint with the New York State Division of Human Rights ("DHR") on October 26, 2020.  Dkt. No. 53-1 at ¶ 24.  Defendants responded to her DHR complaint. *See id.* at ¶ 25.  On January 5, 2021, Defendants responded to Plaintiff's ODI complaint. *See id.* at ¶ 26.  Plaintiff's ALR had already been decreased by this time. *See id.*

Defendants contend that "Plaintiff did not make any complaint of discrimination to anyone at [SUNY Upstate] (other than allegedly her husband) before October 2019."  Dkt. No. 52 at ¶ 59. Plaintiff states that although she "did not formally make a discrimination complaint outside of Dr. Licinio, [she] testified that she had felt discriminated against on the basis of her gender as of April or May 2018." *Id.*  She asserts that "[h]er requests for a salary adjustment in May and June 2018 to President Laraque-Arena and later to Dr. Dewan were her way to raise and attempt to correct the gender discrimination she felt." *Id.*

On April 5, 2021, DHR issued a decision, determining that "probable cause exists to believe Respondent has engaged in or is engaging in the unlawful discriminatory practice complained of."  Dkt. No. 53-1 at ¶ 29.

## III. DISCUSSION

### A.   Summary Judgment Standard

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue

warrant judgment for the movant as a matter of law.  *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted).  When analyzing a summary judgment motion, the court "'cannot try issues of fact; it can only determine whether there are issues to be tried.'"  *Id.* at 36-37 (quotation and other citation omitted).  Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 258 (1986).  In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party.  *See Chambers*, 43 F.3d at 36 (citing *Anderson*, 477 U.S. at 255) (other citations omitted).  Irrelevant or unnecessary facts do not preclude summary judgment, even when they are in dispute.  *See Anderson*, 477 U.S. at 258.

The moving party bears the initial burden of establishing that there is no genuine issue of material fact to be decided.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  With respect to any issue on which the moving party does not bear the burden of proof, it may meet its burden on summary judgment by showing that there is an absence of evidence to support the nonmoving party's case.  *See id.* at 325.  Once the movant meets this initial burden, the nonmoving party must demonstrate that there is a genuine unresolved issue for trial.  *See* FED. R. CIV. P. 56(e).  A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.

**B.    Timeliness of Plaintiff's Claims**

Defendants argue that Plaintiff's allegations concerning conduct that occurred prior to January 21, 2019, are time barred because many of the acts alleged in Plaintiff's complaint occurred more than 300 days before Plaintiff filed her DHR complaint on October 26, 2020.  *See* Dkt. No. 43-27 at 25-26.

11

Plaintiff argues that her claims are timely because of the continuing violations doctrine. *See* Dkt. No. 52-13 at 12-13.  Plaintiff also notes that she filed her ODI complaint on November 1, 2019.  *See id.* at 12.  Finally, she contends that her claims should be subject to equitable tolling because of the COVID-19 pandemic.  *See id.* at 13.

In their reply, Defendants argue that Plaintiff's claims cannot survive because of a purported continuing violation where she has failed to identify a discriminatory policy or mechanism.  *See* Dkt. No. 53 at 7.  Defendants explain a New York State Executive Order concerning the COVID-19 pandemic tolled claims effective from March 20, 2020, through November 3, 2020, but that that Plaintiff's allegations prior to January 21, 2019, are unaffected by this Executive Order.  *See id.*  Finally, Defendants contend that Plaintiff has not shown the applicability of equitable tolling.  *See id.*

"Title VII requires a claimant to file a charge of discrimination with the [Equal Employment Opportunity Commission ("EEOC")] within 180 days of the alleged unlawful employment action or, if the claimant has already filed the charge with a state or local equal employment agency, within 300 days of the alleged discriminatory action."  *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 712 (2d Cir. 1996); *see also* 42 U.S.C. § 2000e-5(e).  "'In states such as New York that have an agency with the authority to address charges of discriminatory employment practices, the statute of limitations for filing a charge of discrimination with the [EEOC] is 300 days.'"  *Ragone v. Atl. Video at Manhattan Ctr.*, 595 F.3d 115, 126 (2d Cir. 2010) (quotation omitted); *see also Harris v. City of New York*, 186 F.3d 243, 248 (2d Cir. 1999).

"The 'continuing violation doctrine,' however, creates an exception to the 300-day rule."  *King v. Aramark Servs. Inc.*, 96 F.4th 546, 559 (2d Cir. 2024) (quoting *Banks v. General Motors*,

LLC, 81 F.4th 242, 259 (2d Cir. 2023)).  Courts have held that "'[u]nder the continuing violation exception to the Title VII limitations period, if a Title VII plaintiff files an EEOC charge that is timely as to any incident of discrimination in furtherance of an ongoing policy of discrimination, all claims of acts of discrimination under that policy will be timely even if they would be untimely standing alone.'"  *Chin v. Port Auth. of New York & New Jersey*, 685 F.3d 135, 155-56 (2d Cir. 2012) (quoting *Lambert v. Genesee Hosp.*, 10 F.3d 46, 53 (2d Cir. 1993), *abrogated on other grounds by Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1 (2011)).  "Specifically, 'the commencement of the statute of limitations period may be delayed until the last discriminatory act in furtherance of it.'"  *Thorpe v. Piedmont Airlines, Inc.*, 926 F. Supp. 2d 453, 463 (N.D.N.Y. 2013) (quoting *Cornwell v. Robinson*, 23 F.3d 694, 703 (2d Cir. 1994)).

"Discrete incidents of discrimination that are unrelated to an identifiable policy or practice, on the other hand, 'will not ordinarily amount to a continuing violation,' unless such incidents are specifically related and are allowed to continue unremedied for 'so long as to amount to a discriminatory policy or practice.'"  *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 907 (2d Cir. 1997) (quoting *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 713 (2d Cir. 1996)).  "[T]he Second Circuit has held that the denial of an increased pay grade does not amount to a continuing violation."  *Staff v. Pall Corp.*, 233 F. Supp. 2d 516, 526 (S.D.N.Y. 2002), *aff'd*, 76 Fed. Appx. 366 (2d Cir. 2003) (citing *Lightfoot*, 110 F.3d at 907).  Other examples of discrete events which do not amount to continuing violations are "failures to obtain promotions and pay raises, demotions and reductions in pay, and failures to obtain certain assignments."  *Sundaram v. Brookhaven Nat. Lab'ys*, 424 F. Supp. 2d 545, 561 (E.D.N.Y. 2006); *see also Fleurentin v. New York City Health & Hosps. Corp.*, No. 18-CV-05004, 2020 WL 42841, *4 (E.D.N.Y. Jan. 3, 2020) ("The Supreme Court has held that failure to promote is a discrete unlawful act and is

13

therefore not subject to the continuing violations doctrine"); *Taylor v. City of New York*, 207 F. Supp. 3d 293, 301 (S.D.N.Y. 2016).

Plaintiff argues that she "has suffered a continuing salary deficiency, resulting in years of lost income and her 'guaranteed' ALR has never been confirmed by Defendants and continues to remain subject to elimination[.]" Dkt. No. 52-13 at 13. However, she presents no argument or evidence about a policy or practice that would allow for the application of the continuing violations doctrine.

In her amended complaint, Plaintiff alleged that "Defendants' systematic pattern of discrimination, and specific retaliation against Plaintiff was further evidenced by the announcement on September 21, 2020, of the promotion of Dr. Schwartz to the position of Chair of Psychiatry, after he had been Interim Chair of Psychiatry for four years." Dkt. No. 12 at ¶ 116. She stated that SUNY Upstate did not go through the required process for appointing Dr. Schwartz nor did they "attempt to establish a search or consider qualified application from under-represented minority backgrounds in violation of SUNY Memorandum: Diversity, Equity, and Inclusion Policy." *Id.* at ¶¶ 117-19. She also asserted that she "was not allowed to apply for the position of Director of the MD-PhD program" as evidence of a pattern of discrimination. *Id.* at ¶ 115.

Plaintiff presents no evidence to support her claims other than her own deposition and declaration. There is no evidence that the initial salary offer, salary negotiations, ALR extension offer, Program Director position, or Chair position were related in any way. Each of the alleged actions are discrete acts that courts have repeatedly concluded do not warrant application of the continuing violations doctrine. *See Staff*, 233 F. Supp. 2d at 526; *Sundaram*, 424 F. Supp. 2d at 561; *Taylor*, 207 F. Supp. 3d at 301.

Additionally, insofar as Plaintiff asserts that she was pursuing her ODI complaint, filing such a complaint does not toll the statute of limitations for filing a Title VII claim.  The Supreme Court has "held that the pendency of a grievance, or some other method of collateral review of an employment decision, does not toll the running of the limitations periods." *Delaware State Coll. v. Ricks*, 449 U.S. 250, 261 (1980); *see Arias-Mieses v. CSX Transp., Inc.*, 630 F. Supp. 2d 328, 333 (S.D.N.Y. 2009) ("[T]he complaint that Arias-Mieses filed with the [Department of Transportation] by letter on June 6, 2008 does not toll the statute of limitations"); *Foster v. Gonzales*, 516 F. Supp. 2d 17, 23 (D.D.C. 2007) ("As a general matter, the Supreme Court has 'held that the pendency of a grievance, or some other method of collateral review of an employment decision, does not toll the running of the limitations period'") (quotation omitted).

The Second Circuit has repeatedly agreed.  *See Paladino v. Potter*, 347 Fed. Appx. 613, 614-15 (2d Cir. 2009) ("[W]e reject Paladino's arguments that the 45-day period should be tolled or did not start to run until the grievance proceedings were completed"); *Woodruff v. Nat'l R.R. Passenger Corp.*, 403 Fed. Appx. 624, 625 (2d Cir. 2010) ("We are not persuaded by plaintiff's contention that his administrative complaint was timely filed within 300 days of the final disposition of a grievance proceeding challenging his termination"); *Francois v. N.Y.C. Dep't of Educ.*, No. 21-601, 2021 WL 4944458, at *2 (2d Cir. Oct. 25, 2021) ("That Francois was required by state law to exhaust administrative appeals before bringing a state suit to challenge the act complained of is of no import in this federal [] action"); *see also Arrocha v. City Univ. of New York*, 878 F. Supp. 2d 364, 369, n.4  (E.D.N.Y. 2012), *aff'd*, 523 Fed. Appx. 66 (2d Cir. 2013) ("It has long been settled that a claim of employment discrimination accrues for statute of limitations purposes on the date the employee learns of the employer's discriminatory conduct [and] the

pendency of a grievance, or some other method of collateral review of an employment decision, does not toll the running of the limitations period").

Accordingly, Plaintiff is not entitled to equitable tolling of her Title VII claims based on her pursuit of an ODI workplace grievance. *See Dent v. N.Y.C. Dep't of Educ.*, No. 22-CV-5357, 2024 WL 3362211, *7 (E.D.N.Y. Mar. 1, 2024) ("Plaintiff's argument that she had been 'pursuing her rights diligently via the procedure indicated by Defendants in her discontinuance letter' . . . does not, by itself, justify equitable tolling"); *Roy v. Buffalo Philharmonic Orchestra*, 684 Fed. Appx. 22, 23 (2d Cir. 2017) ("Roy was not entitled to equitable tolling because of an alleged delay . . . in arbitration proceedings").

Plaintiff's claims are also not subject to equitable tolling based on COVID-19.  It is true that "[o]n March 20, 2020, then Governor Andrew Cuomo issued Executive Order 202.8, 9 N.Y.C.R.R. § 8.202.8, which declared a state of emergency due to the COVID-19 pandemic and 'among other things, toll[ed] the time limits for filing legal actions as prescribed by the state's procedural laws.'" *Cain v. Cnty. of Niagara, New York*, No. 20-CV-1710, 2022 WL 616795, *5 (W.D.N.Y. Mar. 2, 2022) (quoting *Bonilla v. City of N.Y.*, No. 20-CV-1704, 2020 WL 6637214, *1 (E.D.N.Y. Nov. 12, 2020)).  "The Governor then issued a series of nine Executive Orders extending this toll.  On October 4, 2020, the Governor issued Executive Order 8.202.67, the last of periodic extensions of the toll to November 3, 2020." *Id.* (footnote and citations omitted).

Another judge in this District has noted that "[t]his Court is 'bound to apply the law as interpreted by a state's intermediate appellate courts unless there is persuasive evidence that the state's highest court would reach a different conclusion.'" *Bell v. Saunders*, No. 9:20-CV-00256, 2022 WL 2064872, *5 (N.D.N.Y. June 8, 2022) (quoting *V.S. v. Muhammad*, 595 F.3d 426, 432 (2d Cir. 2010)).  "Executive Order 202.8 used the word 'toll' in its operative language, and the

Court does not find any persuasive evidence that the Court of Appeals would reach a different conclusion.  District courts in this Circuit have agreed and found that Executive Order 202.8 and subsequent orders tolled the statute of limitations period from March 20, 2020[,] through November 3, 2020, a total of 228 days." *Id.* (citations omitted).  However, numerous courts have also concluded that the "state Executive Orders had no effect on tolling [] federal statutes of limitation" and "[t]he COVID-19 pandemic alone is insufficient to warrant equitable tolling without a more specific personal reason." *Verne v. New York City Dep't of Educ.*, No. 21-CV-5427, 2022 WL 4626533, *6 (S.D.N.Y. Sept. 30, 2022) (collecting cases).

Plaintiff's attempted reliance on the pandemic to make her claims timely fails for several reasons.  First, Plaintiff is bringing Title VII claims before this Court, which are not governed by state law.  Insofar as this court has extended the Executive Order tolling to a case before it, the Court was analyzing claims brought under 42 U.S.C. § 1983 which takes its timing provisions from state law.  *See Bell*, 2022 WL 2064872, at *5.  Second, Plaintiff has provided no reasons for how the pandemic impacted her ability to file any claims.  Third, the 300 days passed prior to the issuance of the first Executive Order; therefore, it does not apply.  In sum, the COVID-19 pandemic does not warrant equitable tolling of Plaintiff's claims.

Plaintiff's DHR claim was filed on October 16, 2020.  *See* Dkt. No. 52-11.  Three-hundred days prior is December 21, 2019.  Therefore, as Defendants assert, the following acts are time barred: Plaintiff's initial employment offer in 2017, her salary adjustment request in 2018, her lab delay until January or March 2019, and her requests for professor collaboration in January 2019.  As such, these claims are dismissed as untimely.

However, Plaintiff's allegations also concern the appointment of a Program Director and Department Chair in 2020 and 2021. As discussed below, Plaintiff has failed to establish that either situation was a result of discrimination or retaliation.

## C.     Discrimination Claim

"Title VII of the Civil Rights Act of 1964 makes it 'an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or natural origin.'" *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 63 (1986) (quoting 42 U.S.C. § 2000e-3(a)). Discrimination claims under Title VII are analyzed according to the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under the *McDonnell Douglas* framework, a plaintiff must first make a *prima facie* case of discrimination by showing that "(1) she is a member of a protected class; (2) she is qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000) (citing *McDonnell Douglas*, 411 U.S. at 802).

"Once an employee makes a *prima facie* case of [discrimination], the burden shifts to the employer to give a legitimate, non-discriminatory reason for its actions." *Kirkland v. Cablevision Sys.*, 760 F.3d 223, 225 (2d Cir. 2014). If the employer is able to provide such a reason, "the burden shifts back to the plaintiff to show that the employer's explanation is a pretext for race [or sex] discrimination." *Id.* To rebut the articulated justification for the adverse action, "the plaintiff must show 'both that the reason was false, and that discrimination was the real reason.'" *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 n.4 (1993) (internal quotations omitted). "'[T]he plaintiff's admissible evidence must show circumstances that would be sufficient to permit a

rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination.'" *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003) (quotation and citation omitted).

Plaintiff argues that she "clearly experienced an adverse employment action as her salary was dramatically reduced without warning, and contrary to the terms of her PSP Agreement, and she was forced to work under conditions, for example the lack of a functioning lab, that made the successful execution of her job impossible." Dkt. No. 52-13 at 16.  Plaintiff does not cite a single case to demonstrate that such conduct constitutes an adverse employment action.  *See id.* at 16-17.

"[T]he denial of a salary increase can be an adverse employment action." *Bansal v. City of New York*, No. 18-CV-878, 2020 WL 13659112, *9 (E.D.N.Y. Feb. 24, 2020) (citations omitted).  However, the plaintiff must show that the denial "change[d] the terms or conditions of [her] employment" and that she was "entitled to an increase . . . as a matter of course." *Id.* "'[I]f the plaintiff can cite no facts suggesting that discretionary pay was awarded as a matter of course or that [she] was otherwise entitled to expect or rely on it, the employer's decision not to award [the pay] does not change the terms or conditions of Plaintiff's employment,' so as to establish an adverse employment action." *Wilkinson v. New York State*, No. 2:18-CV-4148, 2019 WL 5423573, *10 (E.D.N.Y. Oct. 22, 2019) (quoting *Davis v. N.Y.C. Dep't of Educ.*, No. 10-CV-3812, 2014 WL 917142, *7 (E.D.N.Y. Mar. 7, 2014)).  Additionally, "[c]ourts in this circuit have found that a delay in the administrative processing of benefits does not generally constitute an adverse employment action." *Dechberry v. N.Y.C. Fire Dep't*, 124 F. Supp. 3d 131, 147 (E.D.N.Y. 2015) (collecting cases); *see also Alexidor v. Donahoe*, No. 11-CV-9113, 2017 WL 880879, *6 (S.D.N.Y. Mar. 2, 2017).

Plaintiff has not presented any evidence that she was denied a salary increase that she was entitled to.  Rather, the evidence shows that she was paid more than many of her colleagues.  *See* Dkt. No. 43-8; Dkt. No. 43-18.  Additionally, when Plaintiff asked Dr. Schwartz to rearrange how she was paid, he worked with her to adjust her pay.  *See* Dkt. Nos. 43-11–43-14.  Plaintiff has failed to provide any evidence of how her salary materially altered the terms or conditions of her employment.  Importantly, she has not produced any evidence showing that she was entitled to a specific breakdown of pay as a matter of course.  She presents only her own declarations and depositions espousing what Dr. Laraque-Arena purportedly said.  She argues that Dr. Laraque-Arena promised her ALR would not go anywhere.  *See* Dkt. No. 52 at ¶¶ 11, 13, 16.  However, the evidence demonstrates that Plaintiff knew her ALR was not permanent.

Plaintiff realized in October 2017 that her offer letter from SUNY Upstate and PFP did not match.  *See* Dkt. No. 52 at ¶ 28.  After Plaintiff emailed Dr. Schwartz in October 2017, Dr. Schwartz contacted Dr. Laraque-Arena.  *See* Dkt. No. 43-7 at ¶ 15.  Dr. Laraque-Arena responded, noting that it was Dr. Schwartz' "call" but that her "advice is that [Plaintiff] has not even begun so I would expect her to abide by the agreed upon letter of offer which she signed." Dkt. No. 43-11 at 1.  In May 2018, Dr. Schwartz recommended altering Plaintiff's "salary package to be more commensurate with her peers."  Dkt. No. 43-12 at 1.  Salary adjustments were proposed to Plaintiff, which noted that a part of her pay is the ALR and that ALR had to be renewed and approved each year.  *See id.* at 3.  Dr. Schwartz informed Plaintiff that "I will continue the ALR for a few years to give you time to get [grant] funding, but once your funding allows you a PFP cash take home salary of $45,000+, the ALR should go away."  *Id.*  Plaintiff responded, "Thanks for your message and your careful consideration of this matter.  Can you increase my state base to $180,000?  I will accept it immediately."  *Id.* at 2.  Dr. Schwartz

presented a counteroffer to "increase your permanent SUNY base to $175,000 . . . Lower the

SUNY ALR to $45,000 but we make the time limit on this similar to the PFP stipend with similar

end date below) . . . Continue the PFP $30,000 stipend (two years maximum)." *Id.* He explained

that the school would "protect [Plaintiff's] ALR (now $45,000) and PFP cash stipend (still

$30,000) for just over one more year as this was your built in salary protection while we await

you to ideally obtain federal grants." *Id.* Plaintiff responded, "Yes, you can proceed." *Id.*

In March 2019, Dr. Schwartz emailed Plaintiff after reviewing "salaries of each faculty."

Dkt. No. 43-13 at 1. He noted that Plaintiff's ALR "is due to expire July 1, 2019." *Id.* at 2. He

stated that "[i]t will not be renewed in conjunction with your initial offer letters." *Id.* Plaintiff

responded the same day, stating that "[i]n reality I delayed my coming to [SUNY Upstate] to

decrease the down time in relation to getting preliminary data to support my grant applications. . .

. However, I have been in temporary lab space for 1[.]5 years now, which has had a major

impacted [sic] in my work and the ability to apply for [] grants. Therefore, I would like to discuss

with you whether the PFP temporary salary could be extended." *Id.* at 1. Plaintiff explained that

she was "having a hard time understanding why my ALR is going to expire. In my letter of offer

that ALR does not have an expiration date. . . . [Dr. Laraque-Arena] assured me that the ALR

was not at risk . . . ." *Id.* at 1. Plaintiff asked to set up a meeting to discuss the issues. *See id.*

In April 2019, Dr. Schwartz sent Plaintiff an email following their in-person meeting. *See*

Dkt. No. 43-14. He stated that Plaintiff's "permanent base will continue as is. You negotiated

that your ratio of permanent salary be increased and temporary ALR salary be decreased at a prior

time/negotiation and then did acknowledge receipt and acceptance of this change via email then.

This is being honored." *Id.* Dr. Schwartz explained that Plaintiff's "temporary state ALR will be

extended past the two year mark as your lab was not functional until now which . . . has [been]

apologized for and was beyond the control of the Department.  You asked for a 2-3 year ALR extension."  *Id.*  He stated that he would "extend it 6-12mos with the minimum of 6 months and the max of Dec 31, 2020 which would be about 3 years past your original SUNY pay check here, or an additional [sic].  As your lab is operating, grants are submitted (ideally obtained), papers are published, etc (items all dept researchers are accountable for) throughout then I will try to maximize the length of this ALR salary (Dec 2020) as we will have data to show you are wrapping up the 'start up' phase of your time with us.  This is giving you up to 3 years instead of 2 years of start up/salary buffer."  *Id.*  Dr. Schwartz noted, "[t]his ALR item is actually in excess of usual Dept practice.  The PFP cash start up stipend must end after two years.  This is slated for end of December 2019."  *Id.*  Plaintiff responded, stating that she felt "mislead by the salary negotiation process during [her] recruitment and during the process of re-negotiating the proportion of [her] State base and ALR."  *Id.*  She explained,

> During my recruitment, my negotiations were done with Dr.
> Laraque-Arena and my offer letters were signed by you and Dr.
> Dewan.  And your letters, signed in the same day, referred to my
> state base salary not as synonymous, but in what I learnt later, in
> totally different ways.  Also, during the re-negotiating process of
> the proportion of my State base salary and ALR, my conversation
> with Dr. Laraque-Arena did not include the terms of my ALR.
> During my conversation with Dr. Laraque-Arena, she stated
> numerous times that my ALR was not at risk and she did no[t]
> mention any time limit to my ALR.  Therefore, I think that it was
> disingenuous that you sent me long emails, and that the end of those
> emails included a time limit in my ALR.
>
> I would like to thank you for the offer to extend my ALR; however,
> as I said in the meeting, I am considering my options, and let you
> know were I stand.

*Id.*

Despite Plaintiff's e-mails, she never complained that any of the negotiations, offers, or determinations altered her conditions of her employment.  There is no evidence that the breakdown of Plaintiff's salary or subsequent elimination of her ALR constituted adverse employment actions.

Further, Plaintiff has not explained how her work conditions were negatively impacted by the delay in her lab completion or her recommended faculty's application processing time.  There is nothing in Plaintiff's declaration or deposition explaining how her temporary lab space was insufficient, nor is there any specific information about the other faculty she wished to work with. Plaintiff asserts that she and her husband were geographically separated for five months and "[w]ithout my lab, my productivity and academic progress would be very adversely affected, which would substantially hinder my ability to secure grants needed to continue my scientific studies."  Dkt. No. 52-3 at ¶¶ 25, 27, 30.  Plaintiff has not shown that her progress was actually affected, nor has she presented any case law to support a contention that being separated from one's spouse is an adverse employment action.  In her March 2019 e-mail to Dr. Schwartz, Plaintiff said that she "delayed [her] coming to [SUNY Upstate] to decrease the down time in relation to getting preliminary data to support [her] grant applications."  Dkt. No. 43-13 at 1.  She did not state that she was forced to wait to start at SUNY Upstate because of her lab.  *See id.*  She also stated in her e-mail that the temporary lab space "has had a major impact[] in [her] work." *Id.*  She did not explain how her work was impacted beyond the one conclusory statement.

In her response to Defendants' statement of material facts, Plaintiff avers that her "lab was further delayed by the onset of the COVID-19 pandemic."  Dkt. No. 52 at ¶ 43.  Plaintiff's lab space became fully available in March 2019.  *See* Dkt. No. 53-1 at ¶ 12.  The World Health Organization declared COVID-19 a pandemic in March 2020.  *See* Center for Disease Control,

*Museum COVID-19 Timeline*, https://www.cdc.gov/museum/timeline/covid19.html (last visited Aug. 9, 2024). Plaintiff has provided no explanation or support for how the pandemic impacted her lab. Therefore, Plaintiff has failed to establish that she was subject to adverse employment actions.

She has also failed to present evidence that raises an inference of discrimination based on her gender or ethnicity. As Defendants state, "Plaintiff's own subjective beliefs that she was discriminated against are simply not enough to survive summary judgment." Dkt. No. 43-27 (citations omitted); *see also Moore v. Syracuse City Sch. Dist.*, No. 5:05-CV-5, 2009 WL 890576, *4 (N.D.N.Y. Mar. 31, 2009) ("Plaintiff asserts that he complained about Mrs. Patricia Floyd-Echols' allegedly racist remarks. . . . Plaintiff's own characterization of the evidence fails to show racial animus on the part of Mrs. Floyd-Echols and instead characterizes her use of that language to reference a comment of a student"). "To establish gender bias, plaintiffs can rely on direct evidence including 'statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender.'" *Doe v. Trustees of Hamilton Coll.*, No. 6:22-CV-214, 2024 WL 1675130, *6-7 (N.D.N.Y. Apr. 18, 2024) (quoting *Yu v. Vassar Coll.*, 97 F. Supp. 3d 448, 474-75 (S.D.N.Y. 2015)). "Alternatively, plaintiffs can establish an inference of gender bias by showing 'a combination of (1) procedural irregularities that show a biased process, and (2) surrounding circumstances that suggest that "this bias was likely a sex-based bias.'"" *Id.* (quoting *Doe v. Rochester Inst. of Tech.*, No. 21-CV-6761, 2024 WL 1051953, *10 (W.D.N.Y. Mar. 11, 2024)); *see also Delgado v. Triborough Bridge & Tunnel Auth.*, 485 F. Supp. 2d 453, 463 (S.D.N.Y. 2007) (explaining that the plaintiff "must plead circumstances leading to a permissible inference of racial discrimination including: ethnically degrading terms, invidious comments about her

protected group, or sufficient factual assertions that employees not in her protected group were favored").

Plaintiff argues an inference of discrimination is demonstrated by "Defendants consistent undermining of the Plaintiff, both in terms of her drastically reduced base salary – grossly out of sync with those of her male non-[H]ispanic counterparts – the elimination of her ALR following her protected complaints, and the failure to provide her with a functioning lab, clearly give rise to the inference of discrimination." Dkt. No. 52-13 at 17. Plaintiff testified that she experienced gender discrimination because it was "part of the same pattern of behavior" "in terms of [her] requests" because Dr. Schwartz "cannot help me with my salary structure. He cannot help me with, you know, talking to people about my lab. So he cannot help me in all, like, lots of things." Dkt. No. 43-2 at 130-32. Plaintiff declares that her "email communications with Dr. Schwartz regularly contains harassing and intimidating language by him, including constant threats against me and statements dismissing my thoughts and opinions." Dkt. No. 53-2 at ¶ 35. There is nothing in any of the e-mails provided to the Court that are harassing, threatening, or raise an inference of discrimination. See Dkt. No. 43-11–43-14. No comments were ever made to Plaintiff or anyone else about Plaintiff's gender or ethnicity.

In Dr. Licinio's declaration, he explained a conversation between himself and Dr. Dewan. *See* Dkt. No. 52-12 at ¶¶ 4-7. Dr. Licinio attests that Dr. Dewan "told [Dr. Licinio] that Plaintiff's salary and treatment raised concerns of discrimination under both Title VII and Title IX by virtue of Plaintiff's membership in protected categories, which I specified to Dr. Dewan as female and Latina/Latin Americans." *Id.* at ¶ 5. He stated that "Dr. Dewan told me that he could not give Plaintiff a State base salary that would be higher than the salaries of Professors in the Department, whom he cited by name and who were all male." *Id.* at ¶ 7. Dr. Licinio categorized this as a

"preoccupation with Plaintiff's salary not exceeding that of her male non-Hispanic colleagues."

*Id.* There is no evidence to support that Plaintiff's salary, which was higher than many of her

colleagues, was decided because of her gender or ethnicity.[2] There is no evidence that

Defendants engaged in a pattern of conduct because of Plaintiff's gender or ethnicity.

Without any evidence other than Plaintiff's conclusory assertions, summary judgment is

warranted on Plaintiff's discrimination claim. The Court reaches the same conclusion on

Plaintiff's retaliation claim.

**D.    Retaliation Claim**

"Title VII's antiretaliation provision forbids employer actions that 'discriminate against' an

employee (or job applicant) because [s]he has 'opposed' a practice that Title VII forbids or has

'made a charge, testified, assisted, or participated in' a Title VII 'investigation, proceeding, or

hearing.'" *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59 (2006) (quoting 42 U.S.C.

§ 2000e-3(a)). In order to present a *prima facie* case of retaliation under Title VII, a plaintiff must

present

> "evidence sufficient to permit a rational trier of fact to find [1] that [
> ] he engaged in protected participation or opposition under Title VII
> . . ., [2] that the employer was aware of this activity, [3] that the
> employer took adverse action against the plaintiff, and [4] that a
> causal connection exists between the protected activity and the
> adverse action, *i.e.*, that a retaliatory motive played a part in the
> adverse employment action."

*Kessler v. Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199, 205-06 (2d Cir. 2006) (quotation

omitted). "Upon such a showing, the defendant must articulate legitimate non-discriminatory

reasons for its actions, whereupon the plaintiff bears the burden of showing that the defendant's

---

[2] In Dr. Dewan's declaration, he states that Dr. Licinio e-mailed him about Plaintiff's salary but
"[k]nowing that Dr. Licinio was not supposed to be discussing his wife's salary with me given his
conflict of interest as Dean, I did not respond." Dkt. No. 43-19 at ¶ 13.

explanations are pretext for the true discriminatory motive." *Holt v. KMI-Cont'l*, 95 F.3d 123, 130 (2d Cir. 1996).

"An adverse employment action is a materially adverse change in the terms and conditions of employment." *Mathirampuzha v. Potter*, 548 F.3d 70, 78 (2d Cir. 2008) (citations and quotation marks omitted).  Thus, in order to establish actionable retaliation under Title VII, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have "dissuaded a reasonable worker from making or supporting a charge of discrimination."'"  *Id.* at 68 (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)).  "Material adversity is to be determined objectively, based on the reactions of a reasonable employee," and in context.  *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 568 (2d Cir. 2011).

Within the Second Circuit,

> [e]mployment actions that have been deemed sufficiently disadvantageous to constitute an adverse employment action include "a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation."  As these examples suggest, "[t]o be materially adverse a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities."

*Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 128 (2d Cir. 2004) (internal citations omitted) (quoting *Galabya v. N.Y. City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000)).

Defendants do not dispute that "Plaintiff engaged in a protected activity by filing a complaint with [the] Office of Diversity and Inclusion (ODI) on November 1, 2019 regarding complaints of gender and national origin discrimination."  Dkt. No. 43-27 at 39.  "Nor is there any dispute that not being appointed to the positions of MD/PhD Program Director in 2020 and the

Chair of Psychiatry in 2021 could constitute an adverse employment action." *Id.* Defendants

argue, "[h]owever, that Plaintiff cannot establish a causal connection between her alleged

complaint and not being appointed to the Program Director role and/or the Chair position." *Id.*

Plaintiff's argument that a causal connection exists consists of two paragraphs, contains no

case law, and cites only to her own declaration and deposition. *See* Dkt. No. 52-13 at 27.  Her

argument states as follows:

> Finally, a causal connection exists between Plaintiff's
> protected activities and the adverse action taken against her, i.e.,
> that a retaliatory motive played a part in the adverse employment
> action.  From the outset, Plaintiff was vocal about the
> discriminatory nature of her base salary reduction, the reduction and
> threat of elimination of her ALR, and the failure of Upstate to
> provide Plaintiff with a functioning lab.

> In fact, the elimination of Plaintiff's ALR came only weeks
> after Plaintiff's protected complaints. . . .  SUNY Upstate was not
> accustomed "to women complaining about their salaries," and
> Plaintiff's complaints resulted in the elimination of her ALR.

*Id.* Plaintiff cites to paragraphs 10, 11, 26, and 37 of her declaration.  Paragraph 10 notes that her

SUNY Upstate offer letter stated her base salary of $120,000 with an ALR of $100,000.  *See* Dkt.

No. 52-3 at ¶ 10.  Paragraph 11 states that Plaintiff noticed the inconsistencies between the PFP

letter and the SUNY offer letter.  *See id.* at ¶ 11.  Paragraph 26 explains that "[t]hroughout our

marriage and careers, all of our previous moves and concurrent recruitments to six other academic

institutions happened in a manner that allowed us to start at the new institutions on the same

date." *Id.* at ¶ 26.  Paragraph 37 states "that [s]ince June 2018, Dr. Schwartz and subsequently Dr.

Dewan have both 'de novo' insisted that my ALR was for just two years.  However, a time limit

for the ALR was never discussed in any communications prior to June 2018 between Defendants

and me, and a time limit for the ALR was likewise not written into the two signed contract letters with SUNY Upstate and the PFP." *Id.* at ¶ 37.

Plaintiff is correct that neither the SUNY offer letter or PFP letter state an expiration date for Plaintiff's ALR. *See* Dkt. No. 43-9; Dkt. No. 43-10. Her SUNY offer letter did, however, state that "[s]eparate and apart from your base salary you will receive additional compensation in the amount of $100,000. This additional compensation is not subject to [] negotiated raises, is reviewed annually and is subject to adjustment or renewal, which may also result in an increase in your base salary." Dkt. No. 43-9 at 1.

Plaintiff's memorandum of law also cites to her own deposition. *See* Dkt. No. 52-13 at 27. During her deposition, Plaintiff was asked: "How was the elimination of your A.L.R. an act of discrimination on your gender? I'm sorry. I'm sorry. An act of retaliation based on your gender?" Dkt. No. 43-2 at 211-12. She responded, "I think at SUNY Upstate, they are not used to having women complaining about their salaries. And once I, you know, forced the – the hand I would say for Tom Schwartz to increase my state base, there was what I gained as a result a retaliation." *Id.* at 212.

Plaintiff's statement about what SUNY is "used to" does not create evidence of a causal connection between a protected activity and adverse action based on gender or ethnicity. "[S]elf-serving declarations, not supported by evidence, are generally not sufficient to create an issue of material fact." *789 Ninth & 414 E. 74th Assocs. LLC v. Hundalani*, No. 21-CV-5314, 2023 WL 4472162, *4 (S.D.N.Y. July 11, 2023) (citing, *inter alia*, *Alstom Transp., Inc.*, 346 Fed. Appx. 654, 656 (2d Cir. 2009) (finding that self-serving deposition testimony without "hard evidence adduced during discovery . . . is insufficient to defeat summary judgment"). Although a retaliatory motive can be evidenced by circumstantial evidence, Plaintiff has not produced any

evidence that establishes that a reasonable person would have been deterred from filing the ODI or DHR complaints.

Plaintiff filed her ODI complaint in November 2019, and her DHR complaint in October 2020. *See* Dkt. No. 53-1 at ¶¶ 21, 24. Plaintiff lost her ALR on December 31, 2019. *See* Dkt. No. 43-19 at ¶ 15; Dkt. No. 43-14 at 1. Dr. Dhamoon was selected as Program Director in January 2020, and Dr. Schwartz was appointed to Department Chair in September 2020. *See* Dkt. No. 52 at ¶¶ 48, 52.

Plaintiff does not dispute that for the M.D./Ph.D. Program Director position, the students listed Dr. Amit Dhamoon as their top choice. *See* Dkt. No. 52 at ¶¶ 49-50. She also does not dispute that she was not on the students' list of top choices. *See id.* at ¶ 51. Likewise, Plaintiff does not dispute that Dr. Dhamoon had significant experience mentoring students and went through the program himself. *See id.* at ¶ 52. As to the appointment of Department Chair in 2020, Plaintiff agrees that Dr. Schwartz had been the interim Chair for four years. *See id.* at ¶¶ 53-54. She also does not dispute that "Dr. Dewan approved the decision, given that [] Dr. Schwartz was [a] nationally recognized psychiatrist, had served as interim Chair for four [] years and had done exceptionally well academically and financially with the Department even in the face of the COVID-19 pandemic." *Id.* at ¶ 55.

Plaintiff does not present any evidence supporting a conclusion that she was denied the Program Director or Chair positions because she complained about her salary, let alone that it had anything to do with complaints of discrimination.

"'[A] plaintiff can indirectly establish a causal connection to support a discrimination or retaliation claim by showing that the protected activity was closely followed in time by the adverse employment action.'" *Banks v. Gen. Motors, LLC*, 81 F.4th 242, 277 (2d Cir. 2023)

(quoting *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010)).  "While this Court has 'not drawn a bright line defining . . . the outer limits beyond which a temporal relationship is too attenuated to establish causation,' . . . we have previously held that a period of several months can demonstrate a causal connection between the protected activity and the alleged adverse action."  *Id.* (quotation and citations omitted).  "Where temporal proximity is not the only evidence that bears on a causal connection, we have recognized that the lapse in time between the protected activity and adverse action can be longer."  *Id.* (citation omitted).

"While temporal proximity is enough to satisfy a plaintiff's minimal burden at the *prima facie* stage, '[t]emporal proximity alone is insufficient to defeat summary judgment at the pretext stage.'"  *Rumsey v. Ne. Health, Inc.*, 89 F. Supp. 3d 316, 338 (N.D.N.Y. 2015), *aff'd*, 634 Fed. Appx. 318 (2d Cir. 2016), *as corrected* (Jan. 29, 2016) (quoting *Kwan v. Andalex Group LLC*, 737 F.3d 834, 847 (2d Cir. 2013)); *see also Krul v. DeJoy*, No. 6:20-CV-198, 2023 WL 8449589, *43 (N.D.N.Y. Dec. 6, 2023) (granting summary judgment after recognizing "that temporal proximity plays an important role in establishing indirect evidence of discriminatory or retaliatory animus . . . But temporal proximity alone cannot bear *all* of the weight in getting a circumstantial claim for retaliation over to trial") (citations omitted).

Plaintiff's protected activity—filing the complaints—was only two-to-three months before her ALR was terminated and the Program Director was chosen.  However, there are no disputed facts that could reasonably suggest the actions were retaliatory.  Dr. Schwartz informed Plaintiff that her ALR would be ending prior to her filing her ODI or DHR complaints.  *See* Dkt. No. 43-14 at 1.  Plaintiff's husband did contact Dr. Dewan in March 2019.  *See* Dkt. No. 43-19 at ¶ 13; Dkt. No. 43-20 at 1.  In the letter, Dr. Licinio complained of the "misunderstanding" concerning Plaintiff's ALR.  Dkt. No. 43-20 at 1.  Dr. Licinio noted that Plaintiff's offer letter said her ALR

was "subjected to yearly renewal," but that they both "and [their] attorney saw that as a safeguard from the institution to ensure productivity moving forward." *Id.* Dr. Licinio's e-mail does not mention discrimination, gender, ethnicity, or anything about other professors' salaries. *See id.*

The Second Circuit has noted that "where the adverse action was already ongoing at the time of the protected activity, or is very similar to another adverse action that was taken before the protected activity, with no other change in relevant circumstances, logic precludes any inference of causation." *Young v. Westchester Cnty. Dep't of Soc. Servs.*, 57 Fed. Appx. 492, 495 (2d Cir. 2003) (citing *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001)); *see also Belton v. Borg & Ide Imaging, P.C.*, 512 F. Supp. 3d 433, 446 (W.D.N.Y. 2021) (dismissing Title VII claim where "the 'adverse action' Belton relies upon to support her retaliation claims – defendants' failure to cooperate in her investigation and their hostility towards that investigation – was set in motion *before* she filed her September 2017 EEOC Charge"). Even ignoring the information included in Plaintiff's SUNY offer letter in 2017, her ALR elimination was clearly communicated to Plaintiff through emails in 2018. *See* Dkt. No. 43-12. This is one-to-two years prior to her filing the ODI and DHR complaints.

Nonetheless, assuming, *arguendo*, that the temporal proximity alone establishes *prima facie* retaliation, "[t]o establish pretext, plaintiff must produce sufficient evidence to cast doubt onto defendants' proffered reasons, 'and that more likely than not retaliation for complaints of discrimination was the real reason' for the adverse employment actions." *Lore v. City of Syracuse*, 583 F. Supp. 2d 345, 371-72 (N.D.N.Y. 2008), *on reconsideration in part*, No. 5:00-CV-1833, 2008 WL 5378370 (N.D.N.Y. Dec. 22, 2008) (quoting *Johnson v. Nicholson*, No. 05-CV-2740, 2007 WL 1395546, *8 (E.D.N.Y. May 11, 2007)). "[I]f a plaintiff's 'allegations are conclusory and unsupported by evidence of any weight[,] they are insufficient to satisfy the

requirements under Rule 56(e).'" *Id.* (quoting *Smith v. Am. Exp. Co.*, 853 F.2d 151, 155 (2d Cir. 1988)).  The only evidence to support Plaintiff's assertions are her own statements that there was a retaliatory motive.  *See* Dkt. No. 52-13 at 27.  Plaintiff states that "[t]he decision was clearly in retaliation for Plaintiff's continued complaints regarding inadequate compensation and lab resources as compared to her male and/or non-Hispanic colleagues." *Id.* at 29.  Plaintiff provides no evidence to support this.  Her conclusory statements are insufficient to withstand summary judgment.  Defendants have presented nondiscriminatory and nonretaliatory reasons for eliminating Plaintiff's ALR—it was scheduled to be eliminated and the impending elimination was clearly and continuously communicated to Plaintiff.  They have provided nondiscriminatory and nonretaliatory reasons for appointing other employees to Program Director and Department Chair—they were chosen by the students and staff based on their experiences.  There is no evidence in the record that Plaintiff complained about gender or ethnicity discrimination prior to the creation and implementation of the plan to eliminate her ALR.  Nor is there any evidence that her gender, ethnicity, or complaints played a role in the choice for Program Director or Department Chair.

Based on the foregoing, summary judgment is warranted on Plaintiff's retaliation claim.[3]

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the reasons set forth above, the Court hereby

---

[3] Defendants also argue that the State of New York cannot be a Defendant in this case because Plaintiff has not established an employer-employee relationship.  *See* Dkt. No. 43-27 at 46-47.  Plaintiff responds, arguing that Defendants have waived this argument by not raising it sooner and that New York State controls and maintains SUNY and SUNY Upstate.  *See* Dkt. No. 52-13 at 29.  As Plaintiff has failed to produce any evidence sufficient to create a dispute of fact on either her discrimination or retaliation claim, the Court declines to address this alternative ground for dismissal raised by Defendants.

**ORDERS** that Defendants' motion for summary judgment (Dkt. No. 43) is **GRANTED**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: August 26, 2024
         Albany, New York

Mae A. D'Agostino
U.S. District Judge